IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| QUINTEL TECHNOLOGY LTD., | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | NO. 4:15-CV-00307-ALM-CMC |
| | § | |
| HUAWEI TECHNOLOGIES USA, INC., | § | **FILED UNDER SEAL** |
| FUTUREWEI TECHNOLOGIES, INC., HUAWEI | § | |
| TECHNOLOGIES CO., LTD., AND ZHENGXIANG | § | |
| MA, | § | |
| | § | |
| DEFENDANTS. | § | |

## PLAINTIFF QUINTEL TECHNOLOGY LTD.'S OPPOSITION TO

## DEFENDANTS' MOTIONS IN LIMINE

## Table of Contents

POINT I: DEFENDANTS' MOTIONS IN LIMINE SHOULD BE DENIED ............................1

Motion in Limine No. 1: Undisclosed Trade Secrets ...........................................................1

Motion in Limine No. 2: Products Other than the AAU 3901 and AAU 3902 ...................2

Motion in Limine No. 3: Huawei's Financial Information...................................................2

Motion in Limine No. 4: Third Party's Understanding of Confidentiality..........................3

Motion in Limine No. 5: Existence of Non-Produced NDAs...............................................4

Motion in Limine No. 6: Dismissed Claims .......................................................................5

Motion in Limine No. 7: Allegations of Misconduct Unrelated to the Claims ..................6

Motion in Limine No. 8: New Allegations ..........................................................................7

Motion in Limine No. 9: Discovery Disputes......................................................................8

Motion in Limine No. 10: Comments Regarding Ethnicity or National Origin..................8

Motion in Limine No. 11: Documents Not Part of the Record in the Case.........................8

Motion in Limine No. 12: Expert Opinion Beyond Reports & Testimony ..........................9

POINT II: DEFENDANTS' MOTION TO EXCLUDE

DR. JENSEN'S TESTIMONY SHOULD BE DENIED...................................................10

SUMMARY OF DR. JENSEN'S QUALIFICATIONS AND EXPERTISE ..............................10

ARGUMENT .................................................................................................11

A.    Dr. Jensen May Properly Base His Testimony On His
Understanding And Interpretation of Documents.........................12

B.    Dr. Jensen's Conclusion Regarding Co-Inventorship
s Proper .........................................................................12

C.    Dr. Jensen Can Properly Testify As To What Was
Known And Valuable In The Industry...........................................13

D.    Dr. Jensen Is Not Offering A Legal Opinion On The
Definition Of "Trade Secret".........................................................13

E.    Dr. Jensen Can Properly Opine on the AAU 3902 .......................14

POINT III: DEFENDANTS' MOTION TO EXCLUDE ............................................................... 15

DR. MAGEE'S TESTIMONY SHOULD BE DENIED .................................................... 15

ARGUMENT ................................................................................................... 16

    A.    Lost Patent Ownership Damages ..................................................... 16

        1.    Dr. Magee's Use of Quintel's SONWav Sales Projections Was Appropriate ............................................. 17

        2.    Dr. Magee's Profit Margin and Patent Ownership Premium Assumptions Were Appropriate ........................ 20

    B.    Dr. Magee's Unjust Enrichment Model is Sound ......................... 22

    C.    Dr. Magee's Reasonable Royalty Model is Proper ....................... 24

    D.    Dr. Magee's Market Value of Trade Secret Development Costs is Proper .............................................................. 27

    E.    Dr. Magee Properly Relied Upon His Staff In Preparing His Report ...................................................................... 28

    F.    There is No Basis To Limit Quintel To One Damage Model At Trial ....................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
  694 F. 3d 1312 (Fed. Cir. 2012)......................................................................27

*Alcatel USA v. Cisco Systems*,
  239 F. Supp. 2d 660 (E.D. Tex. 2002)............................................................23

*B.J. Tidwell Indus. v. Diversified Home Prods.*,
  No. SA-06-CA-0264, 2007 U.S. Dist. LEXIS 78227 (W.D. Tex. Oct. 19,
  2007) ........................................................................................................20, 28

*Bianco v. Globus Med. Inc.*,
  No. 2:12-cv-001472014 U.S. Dist. LEXIS 151967 (E.D. Tex. Oct. 27, 2014)............4, 23, 24

*Bohnsack v. Varco, L.P.*,
  668 F. 3d 262 (5th Cir. 2012) .........................................................................22

*Bouygues Telecom, S.A. v. Tekelec*,
  472 F. Supp. 2d 722 (E.D.N.C. 2007).............................................................12

*Braun Elevator Co. v. Thuyssenkrupp Elevator Corp.*,
  379 F. Supp. 2d 993 (W.D. Wis. 2005) ...........................................................21

*Braun v. Clean Harbors Envtl. Servs.*,
  No. 14-cv-524, 2016 U.S. Dist. LEXIS 181697 (E.D. Tex. 2016)......................3

*Burbank v. Compass Bank*,
  No. 1:15-CV-60, 2016 U.S. Dist. LEXIS 92518 (E.D. Tex. Mar. 29, 2016) ..........8

*Creative Dimensions in Mgmt., Inc. v. Thomas Group, Inc.*,
  No. 96-cv-6318, 1999 U.S. Dist. LEXIS 5623 (E.D. Pa. April 16, 1999)..............21

*Datatreasure Corp. v. Wells Fargo & Co.*,
  No. 2:06-cv-72-DF (Dkt. 2392 at 43) (E.D. Tex. Oct. 5, 2010) .................2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................................11, 12, 16, 28

*Ervin v. Kroger*,
  No. 4:14-cv-262, 2015 U.S. Dist. LEXIS 179332 (E.D. Tex. June 3, 2015) ..........16

*Gussack v. Xerox Corp.*,
  224 F. 3d 85 (2d Cir. 2000)............................................................................29

i

*i4i Ltd. P'ship v. Microsoft Corp.*,
 598 F. 3d 831 (Fed. Cir. 2010) ............................................................................27

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
 274 F. 3d 1371 (Fed. Cir. 2001).........................................................................26

*Mathis v. Exxon Corp.*,
 302 F. 3d 448 (5th Cir. 2002) ..............................................................................12

*Mattel, Inc. v. Mga Entm't, Inc.*,
 No. 04-cv-9049, 2011 U.S. Dist. LEXIS 161798 (C.D. Cal. Jan. 26, 2011) ...........14

*McReynolds v. Sodexho Marriot Servs.*,
 348 F. Supp. 2d 30 (D.C. Dist. Ct. 2004) .............................................................29

*More JB, Inc. v. Nutone Inc.*,
 No. A-05-CA-338, 2007 U.S. Dist. LEXIS 102151 (W.D. Tex. Mar. 21, 2007)...................16

*Paltalk Holdings, Inc. v. Microsoft Corp.*,
 No. 2:06-cv-367, 2009 U.S. Dist. LEXIS 131090 (E.D. Tex. Feb. 25, 2009)...........6

*Paltalk Holdings, Inc. v. Microsoft Corp.*,
 No. 2:06-CV-367 (DF), 2009 U.S. Dist. LEXIS 131088 (E.D. Tex. Feb. 11,
 2009) ......................................................................................................10

*Phillips v. Frey*,
 20 F.3d 623 (5th Cir. 1994) ..................................................................................4

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
 382 F. 3d 546 (5th Cir. 2004) ........................................................................14, 20

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
 22 F. Supp. 3d 585 (E.D. Va. 2013) .....................................................................23

*Rembrandt Wireless Techs. v. Samsung Elecs. Co., Ltd.*,
 No. 2:13-cv-213-JRG-RSP, 2015 U.S. Dist. LEXIS 20306 (E.D. Tex. Jan. 30,
 2015) ......................................................................................................6

*Right of Way Maintenance Co. v. Gyro-Trac, Inc.*,
 No. H-05-cv-4081, 2007 U.S. Dist. LEXIS 34648 (S.D. Tex. May 11, 2007).......................20

*Safco Prods. Co. v. Welcom Prods.*,
 799 F. Supp. 2d 967 (D. Minn. 2011) ...................................................................13

*Skyhook Wireless v. Google*,
 No. CV 10-11571-RWZ, 2015 WL 13620764 (D. Mass. Feb. 18, 2015) ...............27

*Softel v. Dragon Medical and Scientific Comms.*,
    891 F. Supp. 935 (S.D.N.Y. 1995) ..................................................................27

*Summit Elec. Supply Co. v. IBM*,
    No. 07-cv-431, 2010 U.S. Dist. LEXIS 146665 (D.N.M. Sept. 30, 2010) ............12

*Uniloc USA v. Microsoft Corp.*,
    632 F. 3d 1292 (Fed. Cir. 2011)...........................................................................23

*University Computing Co. v. Lykes-Youngstown Corp.*,
    504 F. 2d 518 (5th Cir. 1974) ..............................................................................22

*Waite Hill Servs. V . World Class Metal Works*,
    959 S.W.2d 182 (Tex. 1998)................................................................................30

*Waymo LLC v. Uber Techs., Inc.*,
    No. C 17-cv-00930, 2017 U.S. Dist. LEXIS 183688 (N.D. Cal. Nov. 6, 2017)...............22, 23

*Wellogix v. Accenture, L.L.P.*,
    2013 U.S. App. LEXIS 25944 (5th Cir. 2013) ....................................................27

**Statutes**

Tex. Civ. Prac. & Rem. Code § 41.010 ..........................................................................3

Tex. Civ. Prac. & Rem. Code § 41.011 .......................................................................3, 7

**Other Authorities**

Fed. R. Civ. P. 26(a)(1), (e) ............................................................................................9

Fed. R. Civ. P. 37(c) ......................................................................................................9

FED. R. CIV. P. 803(8) .....................................................................................................7

Fed. R. Evid. 403 ............................................................................................................7

Fed. R. Evid. 404 ............................................................................................................7

FED. R. EVID. 406 .......................................................................................................5, 7

FED. R. EVID. 702........................................................................................11, 13, 14, 22

Fed. R. Evid.  703 .........................................................................................................29

## POINT I: DEFENDANTS' MOTIONS IN LIMINE SHOULD BE DENIED

**Motion in Limine No. 1: Undisclosed Trade Secrets**

Quintel has not deviated from the identification of its trade secrets it has used throughout this litigation. Defendants' motion regarding "undisclosed" trade secrets narrowly relies on the Amended Complaint and a three-point summary recitation the parties have used to refer to Quintel's trade secrets; it does not itself encompass the entire scope of Quintel's trade secrets that are at issue. Quintel early on in discovery provided a detailed description of its trade secrets (Brydges Decl. Ex. A (Quintel's Objections Responses to Def. Interrogatories at 5-11)) and thereafter did the same through its technical expert, Dr. Michael Jensen. Dkt. 143-1 (Jensen Decl. ¶ 10). Quintel's articulation of the scope of its trade secrets also is fully set forth in its summary judgment opposition papers, which are incorporated herein by reference. *See e.g.* Dkt. 152 at p. 10-11, 21. Quintel does not intend to introduce evidence of trade secrets that it has not already disclosed and as to which the parties have had extensive discovery.

Similarly, Quintel is not "altering the terminology" of its trade secrets. While Defendants argue Quintel's characterization of its trade secrets in terms of "application," "technology," or "implementation" is an expansion, the parties have used these descriptions throughout the case. For example, Dr. Jensen's expert report continually refers to Quintel's trade secrets as technology, application, and implementation. *See e.g.* Brydges Decl. Ex. B (Jensen Report ¶ 28; ¶ 69). Defendants' own experts do the same in their reports. *See e.g.* Brydges Decl. Ex. C (Balanis Report ¶¶ 18, 45); Ex. D (Long Report ¶¶ 34, 35, 36, 39, 95). The Court has referred to Quintel's trade secrets as "Quintel's technology" (*see e.g.*, Dkt. 190 at 37-38), Defendants' attorneys have used that phrase during depositions (*see e.g.* Brydges Decl. Ex. E (Piazza Dep. at 26:4-5, 44:3-8, 44:21-45:7, 46:14-17, 60:25-61:25, 64:23-65:2)), and, perhaps most importantly,

the parties themselves referred to Quintel's Per User Tilt "technology" during the relevant 2009 and 2010 period. *See, e.g.*, Brydges Decl. Ex. F (Ma Dep. Exs. 12, 18, 32); Ex. G (Chen Dep. Ex. 4); Ex. H (Kaiser Dep. Exs. 29, 48); Ex. I (Du Dep. Ex. 10).

Quintel is not alleging misappropriation of any trade secrets that it has not disclosed and it should not be arbitrarily or artificially limited in its descriptions.

**Motion in Limine No. 2: Products Other than the AAU 3901 and AAU 3902**

From the beginning, Defendants have sought to limit their exposure in this case only to their misappropriation related to Huawei's AAU 3901 and AAU 3902 products. Since then, Defendants produced millions of pages of additional documents after the close of fact discovery, revealing that they also incorporated features of Quintel's technology in other products, including evolutions of the AAU 3902 product. *See, e.g.*, Brydges Decl. Ex. J (Ex. T to 11-10-17 Wads Reply Decl. (HUA_QTL01470304-05)). While this Court agreed with the Magistrate Judge that Quintel is not entitled to additional damages discovery (Dkt. 207), it should not preclude Quintel from presenting evidence of other Huawei products that also utilize Quintel's trade secrets. Such evidence is relevant, among other reasons, to contradict Defendants' experts' conclusions that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Brydges Decl. Ex. D (Long Report p. 21-28); Ex. K (Bakewell Report ¶ 114-115, 132). Quintel should not be prohibited from utilizing Defendants' own documents at trial. Whether Quintel's technology is present in any other product is a question for the jury to hear and weigh.

**Motion in Limine No. 3: Huawei's Financial Information**

Unlike the patent cases cited by Defendants, where enhancement damages are determined by the Court (*see Datatreasure Corp. v. Wells Fargo & Co.*, No. 2:06-cv-72-DF (Dkt. 2392 at

43) (E.D. Tex. Oct. 5, 2010)), in a trade secret misappropriation case the trier of fact determines

whether to award exemplary damages and the amount.  Tex. Civ. Prac. & Rem. Code § 41.010.

In making this determination, "the trier of fact shall consider evidence" relating to, among other

things, "the net worth of defendant."  Tex. Civ. Prac. & Rem. Code § 41.011.  Thus, Quintel is

entitled to introduce such information as part of its proof on exemplary damages.  *See Braun v.*

*Clean Harbors Envtl. Servs.*, No. 14-cv-524, 2016 U.S. Dist. LEXIS 181697, at *11-12 (E.D.

Tex. 2016).

 Moreover, the nine documents Defendants identify as evidencing the financial condition

of "other Huawei entities" are all Huawei Annual Reports from 2009-2016.  Whether or not

these documents reference the financial condition of non-party Huawei entities, they are the *only*

relevant documents Defendants provided in this action.  In response to Quintel's request for

production of Defendants' financial statements from 2009 to the present, Defendants responded

by referring Quintel to Huawei Investment & Holding Co., Ltd.'s "publically available annual

reports."  Brydges Decl. Ex. L (Defendants Objections and Responses to Plaintiff Quintel's First

Requests for Production at pp. 41-42).  Since the Annual Reports are the very documents

Defendants referenced regarding their financial information, Defendants may not object to their

use at trial.  Indeed, Defendants should simply stipulate to the facts contained therein.

**Motion in Limine No. 4: Third Party's Understanding of Confidentiality**

 Defendants mischaracterize declarations from Quintel's witness to seek an overbroad and

unnecessary order.  Quintel's witnesses will not testify outside of their personal knowledge.

Quintel's witnesses, however, should not be precluded from discussing *their* understandings of

confidential third party disclosures and the confidential treatment given to Quintel's technology

after those disclosures.  For example, Quintel witnesses must be allowed to testify to the context

of third party disclosures, the precautions taken by Quintel to protect its trade secrets, and the facts and circumstances making clear that third parties should have and would have known the disclosures were made in confidence. Quintel should not be precluded from offering its impressions about how information was received and treated by third parties; such evidence is appropriate and relevant under Texas trade secret law. *See Bianco v. Globus Med. Inc.*, No. 2:12-cv-001472014 U.S. Dist. LEXIS 151967 at *34 (E.D. Tex. Oct. 27, 2014) ("'A person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret [if] . . . (1) the person knew or had reason to know that the disclosure was intended to be in confidence, and (2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality'" (quoting Restatement (Third) of Unfair Competition § 41 (1995)).

**Motion in Limine No. 5: Existence of Non-Produced NDAs**

Defendants' motion in limine on the existence of non-produced NDAs should be denied for several reasons. First, Quintel's witnesses have testified repeatedly, with documentary support, that even where there was no written non-disclosure agreement in place, all third-party disclosures were in the context of exploring business opportunities, and Quintel made clear that it was sharing its technology in confidence. *See e.g.* Brydges Decl. Ex. E (Piazza Dep. at 242:23-243:7, 258:9-14); Ex. M (Veni Dep. at 127:7-15; 258:22-259:7). Quintel should not be precluded from offering evidence and testimony about informal understandings or agreements, which, under Texas law are sufficient to maintain trade secret status. *Phillips v. Frey*, 20 F.3d 623, 631 (5th Cir. 1994).

Second, Defendants seek to preclude Quintel from offering testimony regarding written non-disclosure agreements it has been unable to locate. Quintel's witnesses are entitled to testify

about Quintel's routine practices, including the extent to which it would have entered into written non-disclosure agreements, regardless of whether Quintel was able to locate those documents. FED. R. EVID. 406. Defendants, of course, may cross-examine these witnesses. Their testimony should not be excluded.

Finally, Quintel does not object to an order instructing both parties that they may not use or testify about documents which that party "has failed to produce in violation of its discovery obligations." The written NDAs at issue here, however, do not fall within that category. Quintel has no obligation to produce documents it is unable to locate after a reasonably diligent search.

**Motion in Limine No. 6: Dismissed Claims**

As this Court is aware, Quintel has objected to Magistrate Judge Craven's Reports and Recommendations insofar as they recommend dismissal of all or portions of Quintel's breach of contract, unfair competition by misappropriation, and correction of inventorship claims. (Dkt. 187 and Dkt. 199). To the extent such recommendations are adopted by the Court, Quintel will not object to an order stating that the parties may not discuss any dismissed claim, or the fact that it has been dismissed.

However, Defendants' sixth motion in limine is much broader than that. Defendants seek to preclude *any* evidence relating to these claims. Such an order is not only impractical but would impede Quintel's ability to present evidence related to the remainder of its claims. Many of the facts that make up the recommended dismissed claims also are relevant to Quintel's other claims. For example: Quintel cannot present its case without discussing the development of its technology, cannot discuss the developing relationship between the parties without referencing Defendants' failure to destroy documents (whether or not it is time-barred as a standalone claim),

and cannot leave out David Barker's development of Quintel's Per User Tilt technology, regardless of whether he meets the legal standard of a co-inventor of the '647 Patent.

Defendants have not explained how such evidence would cause prejudice or "impugn Defendants' character." Both cases Defendants cite in their motion are in the context of a *plaintiff's* motion in limine to preclude a defendant from discussing or referencing dismissed or abandoned claims. *Defendants* should be similarly barred from making such references in this case if those circumstances are presented, but nothing in those cases should preclude *Quintel* from presenting any and all evidence that relates to its remaining claims. *Rembrandt Wireless Techs. v. Samsung Elecs. Co., Ltd.*, No. 2:13-cv-213-JRG-RSP, 2015 U.S. Dist. LEXIS 20306, at *13 (E.D. Tex. Jan. 30, 2015); *Paltalk Holdings, Inc. v. Microsoft Corp.*, No. 2:06-cv-367, 2009 U.S. Dist. LEXIS 131090, *6-7 (E.D. Tex. Feb. 25, 2009).

**Motion in Limine No. 7: Allegations of Misconduct Unrelated to the Claims**

The documents cited in Defendants' Motion in Limine No. 7 are relevant and must be admitted for several reasons. ███████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████ Brydges Decl. Ex. N (Reed 30(b)(6) Dep. 124:6-125:25). ██████████████████████████████████████
█████████████████████████████████████████ Brydges Decl. Ex. V (Du Dep. at 75:25-77:3). Given that █████████████████████
███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████, the ████

████████████ and related newspaper stories are highly relevant.

As for the other documents that Defendants seek to preclude, those documents show Defendants' ██████████████████████████████████████ Because the jury will be responsible for determining exemplary damages, it should be permitted to consider evidence relating to "the character of [Defendants'] conduct"; Defendants' "degree of culpability"; Defendants' "situation and sensibilities"; and "the extent to which [Defendants'] conduct offends a public sense of justice and propriety." Tex. Civ. Prac. & Rem. Code § 41.011. Evidence of Defendants' misconduct is relevant to each of these considerations and important for the jury to consider in determining whether and to what extent punitive damages are appropriate.

Quintel will not offer these exhibits to show a witness's "bad character" under Fed. R. Evid. 404, but instead Defendants "routine practice[s]" under Fed. R. Evid. 406 and they are admissible as non-hearsay or under the public records exception. FED. R. CIV. P. 803(8). Finally, in light of the above, this evidence is not unduly prejudicial and its probative value outweighs any of Defendants' Rule 403 concerns.

**Motion in Limine No. 8: New Allegations**

Defendants are simply wrong regarding Quintel's purportedly "new allegations." First, Quintel's claim that Defendants have acquired its trade secrets through improper means, i.e. breach of the parties' non-disclosure agreement, is described in detail and plainly pled in Quintel's Amended Complaint. Dkt. 20 ¶¶ 48-54, 75-78.

Quintel's claim for fraud by nondisclosure, which is a "subcategory of fraud" with the addition of nondisclosure (*Burbank v. Compass Bank*, No. 1:15-CV-60, 2016 U.S. Dist. LEXIS 92518, *13 (E.D. Tex. Mar. 29, 2016)) was also included in its First Amended Complaint. Quintel clearly pled a fraud cause of action (Dkt. 20 ¶¶ 86-93), Defendants' duty to Quintel under the non-disclosure agreement (*id*. ¶¶ 16, 21-24), and Defendants' repeated fraudulent concealments (*id*. ¶¶ 48-51).  Fraud by non-disclosure also was a part of Quintel's opposition to Defendants' motion to dismiss (Dkt. 30 at 1-6) and summary judgment motions (Dkt. 151 at 1-10; Dkt. 152 at 35).  And, in denying Defendants' motion for summary judgment on fraud, the Court acknowledged Quintel's evidence that Defendants "never informed Quintel they were [misusing Quintel's confidential information for their own commercial benefit] and took steps to conceal their wrongdoing."  Dkt. 190 at 62.

**Motion in Limine No. 9: Discovery Disputes**

Quintel has no objection to Defendants' Motion in Limine No. 9.

**Motion in Limine No. 10: Comments Regarding Ethnicity or National Origin**

Quintel does not object to Defendants' Motion in Limine No. 10 to the extent that it applies to limit all parties from disparaging any other party or witness based on his or her nationality or residency.  However, the location of and residency of several parties and witnesses in this case is a necessary part of understanding the facts and will undoubtedly come up during trial.  The jury will hear from witnesses residing in other countries and will see exhibits in different languages.  The parties should not be unduly restrained from referencing nationalities and residences in a manner consistent with their ethical and professional obligations.

**Motion in Limine No. 11: Documents Not Part of the Record in the Case**

Defendants improperly characterize thirty-three of Quintel's exhibits as inadmissible under Fed. R. Civ. P. 37(c). Contrary to Defendants' contention, all of the documents have been either disclosed in the case or are otherwise known to Defendants. Fed. R. Civ. P. 26(a)(1), (e). As discussed in response to Defendants' Motion in Limine No. 3, several of these documents (PTX0033, 93, 210, 265, 266, 268, 269, 391, 392) are Annual Reports that Defendants referred to in response to a request for production. Others are publicly available documents that were attached as exhibits on motions or considered by experts and disclosed to Defendants (PTX0206, 214, 227, 247, 255, 287). Defendants' list also includes a set of publicly available patent documents, many of which were exchanged during discovery and were also part of Quintel's initial disclosures (PTX0161, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404). Brydges Decl. Ex. O (Quintel's Initial Disclosures at 5-6).

As discussed above, ███████████████████████████████████ ██████████████, is plainly relevant and has been addressed in several depositions. The related New York Times articles are similarly relevant (PTX0314, 316), and Huawei is well aware of the recent verdict for misappropriation of T-Mobile's trade secrets (PTX0288).

Finally, Quintel only recently discovered Huawei's 2017Antenna Line Product Catalogue (PTX0549) which is relevant and should have been produced by Defendants; Defendants cannot claim that they were unaware of their own product catalogue.

**Motion in Limine No. 12: Expert Opinion Beyond Reports & Testimony**

Quintel agrees that no expert should be permitted to testify beyond the opinions expressed in his reports and deposition testimony. Defendants are incorrect, however, that the matters discussed in Dr. Jensen's declaration are "new." Defendants already moved to strike the declaration, and the Magistrate Judge recommended denial of that motion, holding that

Defendants had not shown that "the declaration contains new opinions or seeks to modify the content of Dr. Jensen's expert reports." Dkt. 190 at 29. To the extent Defendants now seek to reargue that motion, Quintel refers the Court to its papers opposing the motion to strike. Dkt. 175. As fully explained therein, Dr. Jensen is not limited to testifying to the exact phrasing of his expert report and is allowed "elaborations on opinions already expressed." *Paltalk Holdings, Inc. v. Microsoft Corp.*, No. 2:06-CV-367 (DF), 2009 U.S. Dist. LEXIS 131088, at *7–8 (E.D. Tex. Feb. 11, 2009).

Moreover, Defendants mischaracterize Dr. Magee's opinions. He has made clear that he is "not offering a legal opinion on whether a particular measure of damages is recoverable for a particular legal claim." Brydges Decl. Ex. P (Magee Reply Rep. ¶ 22). That is a legal issue for the Court. *See, e.g.*, *infra* Point III(F). Thus, there is no need for an order precluding Dr. Magee or any other expert from opining on the applicability of any particular damage model to any particular cause of action. See Brydges Decl. Ex. R (Magee Initial Report ¶ 11 and n. 1).

## POINT II: DEFENDANTS' MOTION TO EXCLUDE DR. JENSEN'S TESTIMONY SHOULD BE DENIED

### SUMMARY OF DR. JENSEN'S QUALIFICATIONS AND EXPERTISE

Defendants seek to denigrate the credentials of Quintel's technical expert Dr. Jensen, dismissively labeling him a mere "electrical engineering academic" and suggesting that his opinions are not well informed. Def. MIL at 10. Dr. Jensen is the Dean of the Ira A. Fulton College of Engineering and Technology at Brigham Young University ("BYU") and a tenured Professor of Electrical and Computer Engineering. Brydges Decl. Ex. B (Jensen Initial Rep. ¶ 1). He earned his Bachelor and Master of Science at BYU and his Ph.D from the University of California at Los Angeles in 1994. For 23 years, he has taught graduate and undergraduate

courses in the areas of electromagnetic field theory (including antenna design and analysis), radio frequency circuit design, signal processing, and communications systems. *Id*. ¶¶ 2-3.

Dr. Jensen is a Fellow of the IEEE, and immediate Past-President of the IEEE Antennas and Propagation Society. He also has authored or co-authored 280 technical articles and book chapters in the areas of antenna design, wireless communications, optical fiber communications, and radar systems. He has extensive experience and expertise in the fields of cellular antenna technology, including antenna arrays and beamforming, and has 27 years of experience in the design and analysis of wireless and transmission communications systems. He has consulted with various companies to create antenna and circuit designs for such systems, and has developed designs in his work as a Senior Scientist at Wavetronix, LLC, the company he founded in 2000. *Id*. ¶¶ 4-8.

## ARGUMENT

The Federal Rules of Evidence provide that a witness such as Dr. Jensen who is "qualified as an expert by knowledge, skill, experience, training or education may" provide expert testimony if such testimony "will assist the trier of fact to understand the evidence or determine a fact issue[.]" FED. R. EVID. 702. As the Advisory Committee Notes make clear, the "rejection of expert testimony is the exception rather than the rule" under the standard. *Id*., Advisory Committee's Note (2000).

To be sure, the Court acts as a gatekeeper for the admission of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Nevertheless, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" to challenge expert testimony. *Id*. at 596.

Accordingly, "[t]he *Daubert* analysis should not supplant trial on the merits."  *Mathis v. Exxon Corp.*, 302 F. 3d 448, 461 (5th Cir. 2002).

### A. Dr. Jensen May Properly Base His Testimony On His Understanding And Interpretation of Documents

Defendants first contend that Dr. Jensen should be precluded from providing "his opinion of Huawei's thoughts and beliefs via interpretation of various documents."  Def. MIL at 10.  Dr. Jensen will not provide his opinions on Huawei's "thoughts and beliefs."  The referenced portions of Dr. Jensen's reports constitute his *understanding* and *interpretation* of highly technical documents and information well within his field of expertise on matters relevant to Quintel's claims.  He is not purporting to read Huawei's "mind."  And even to the extent Dr. Jensen's statements can be interpreted to refer to Huawei's or Dr. Ma's "state of mind" or knowledge, they are no doubt proper in this complex trade secrets matter.  As one court has observed in strikingly similar circumstances:

> As is clear from even a cursory review of the evidence in this matter, the facts surrounding the claims at issue are highly complex and technical. The average layperson has no experience pertaining to what is or is not common knowledge within the telecommunications field. The same holds true for the Jeffay, Stout and Utas reports, which all offer opinion within their relative areas of expertise as to what defendant, or its employees were aware of based on documents and evidence reviewed. As such, testimony regarding the knowledge of defendant would be helpful to the trier of fact, and to the extent it is premised on reliable methodology within the scope of relevant expertise, it is therefore permissible.

*Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 727 (E.D.N.C. 2007); *see Summit Elec. Supply Co. v. IBM*, No. 07-cv-431, 2010 U.S. Dist. LEXIS 146665, at *27 (D.N.M. Sept. 30, 2010).

### B. Dr. Jensen's Conclusion Regarding Co-Inventorship is Proper

"If a proposed expert possesses expertise in the general field at issue that could be helpful to the [trier of fact, the trier of fact] is entitled to hear that testimony and accord it whatever weight it deems appropriate." *Safco Prods. Co. v. Welcom Prods.*, 799 F. Supp. 2d 967, 998 (D. Minn. 2011). Here, Dr. Jensen's extensive expertise in the field of antenna design and analysis well qualifies him to opine on Dr. Ma's use and inclusion of Quintel's PUT technology in the '647 Patent. What is more, there is *no dispute* that Dr. Ma did not list Mr. Barker as a co-inventor on the patent. As such, Dr. Jensen's testimony will be helpful to the Court in determining the issue of inventorship, and Defendants' motion seeking to preclude such testimony should be denied.

## C. Dr. Jensen Can Properly Testify As To What Was Known And Valuable In The Industry

Defendants' suggestion that Dr. Jensen is not qualified to testify regarding what was "known" or valuable in the industry cannot be taken seriously. Defendants' attempt to minimize the breadth and significance of Dr. Jensen's credentials should be rejected.

An expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. As set forth above, Dr. Jensen is qualified in each of these respects. Through his impeccable academic credentials, his involvement with the IEEE -- the largest technical professional organization in the world -- and his experience in actually designing wireless and antenna systems, he is more than qualified to opine on the industry itself and what is both "known" and "valuable" in the industry. Any perception that Dr. Jensen lacks sufficient "industry experience" -- however unfounded (and it is) -- goes to the weight of his testimony, not its admissibility.

## D. Dr. Jensen Is Not Offering A Legal Opinion On The Definition Of "Trade Secret"

Contrary to Defendants' suggestion, Dr. Jensen will not be opining on the legal definition of "trade secret." What he will do -- and is permitted to do based upon his expertise and Rule 702 -- is provide his opinion on the extent to which Quintel's technology was well known or valuable in the industry, as well as addressing many of the factual questions that play a role in determining what constitutes a trade secret. Indeed, given that the trade secret factors "are most relevant when a court lacks direct evidence, *like an expert's opinion*, about whether the alleged trade secret was well known or valuable because of its secrecy," Dr. Jensen's opinions in this respect are directly relevant and will be helpful to the jury. *Mattel, Inc. v. Mga Entm't, Inc.*, No. 04-cv-9049, 2011 U.S. Dist. LEXIS 161798, at *46-47 (C.D. Cal. Jan. 26, 2011) (emphasis supplied).

### E.    Dr. Jensen Can Properly Opine on the AAU 3902

Defendants' last arguments regarding Dr. Jensen appear to be premised upon the contention that his opinions regarding the AAU 3902 product and its employment of Quintel's technology are somehow not reliable, either because he did not physically inspect the product or because he describes the product as having "a necessary capability to enable Per User Tilt." The first contention regarding physical inspection is easily disposed of: it goes to the bases and sources of his opinions, which affect their weight rather than their admissibility. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F. 3d 546, 562 (5th Cir. 2004). And considering that Defendants' contributed to Quintel's and Dr. Jensen's inability to inspect the product by refusing to make it available outside of China, the argument is particularly unfounded. Dkt. 89-1.

The second point, while abstruse, is equally misguided. Defendants have taken a single sentence from Dr. Jensen's discussion of Huawei's incorporation of Quintel's technology in its products (Brydges Decl. Ex. B (Jensen Initial Rep. ¶¶ 149-53)), together with two isolated

deposition answers (Def. MIL at 15) to argue that Dr. Jensen's opinions are unreliable. The evidence to which they cite shows no such thing.

Finally, Defendants also take issue with Dr. Jensen's observation regarding the "similar[ities]" between certain figures found in the '647 Patent and Quintel proprietary diagrams, as though Dr. Jensen made the observation in a vacuum, with nothing more. Defendants ignore that Dr. Jensen follows his "similarity" discussion with an extensive analysis, in painstaking detail, regarding Defendants' incorporation of Quintel's technology in the '647 Patent. Brydges Decl. Ex. B (Jensen Initial Rep. ¶¶ 157-162); Ex. Q (Jensen Reply Rep. ¶¶ 69-74). Here, Dr. Jensen applies his expertise, knowledge, education, and training to the facts -- his understanding of Quintel's technology and the claims in Huawei's '647 Patent -- to show that the latter incorporated the former. That Defendants would argue such testimony is unreliable is baseless. The motion should be denied.

## POINT III: DEFENDANTS' MOTION TO EXCLUDE DR. MAGEE'S TESTIMONY SHOULD BE DENIED

### SUMMARY OF DR. MAGEE'S QUALIFICATIONS AND EXPERTISE

Dr. Magee is the Bayless/Enstar Professor of Finance and Economics at the University of Texas at Austin, where he has taught since 1976. Brydges Decl. Ex. R (Magee Initial Report ¶ 5). He teaches managerial micro-economics and international finance in the Graduate School of Business. Prior to his position at UT Austin, he taught at the University of California at Berkeley and the University of Chicago. *Id.*

Dr. Magee earned his PhD in economics from the Massachusetts Institute of Technology and has served as an economic advisor to four presidential administrations. He has published nearly 80 academic articles and three books and has served on the editorial boards of six academic journals. His research interests focus, *inter alia*, on the economics of intellectual

property, the calculation of royalty rates and patent infringement damages, bioeconomics and international finance.  Since 2013, Dr. Magee has testified as an expert witness in at least 30 matters in state and federal cases across the country, including 10 matters in Texas courts.  *Id*. (Magee Report Ex. 1).

**ARGUMENT**

Defendants claim that none of the four damages models to which Dr. Magee will testify meets the standard of reliability established in *Daubert*.  At its heart, Defendants' attack on Dr. Magee demonstrates nothing more than that they disagree with his conclusions.  This is an insufficient basis to exclude expert testimony.  *See, e.g., Ervin v. Kroger*, No. 4:14-cv-262, 2015 U.S. Dist. LEXIS 179332, at *11 (E.D. Tex. June 3, 2015) ("While it is apparent that Defendants disagree with the conclusions reached by [the expert], this alone does not make his conclusions unreliable."); *More JB, Inc. v. Nutone Inc.*, No. A-05-CA-338, 2007 U.S. Dist. LEXIS 102151, at *24 (W.D. Tex. Mar. 21, 2007) ("*Daubert*, however, does not judge the expert conclusions themselves.").  Dr. Magee's opinions are premised upon his review of a host of documents, including documents produced by Huawei and Quintel in this litigation, publicly available data, conversations with Quintel personnel, and the deposition testimony of numerous witnesses. Brydges Decl. Ex. R (Magee Initial Report ¶ 9).  Each of his four theories is properly grounded in reliable data and in Dr. Magee's experience, education, and analysis.

**A.      Lost Patent Ownership Damages**

Dr. Magee will testify that because of Defendants' misappropriation of Quintel's trade secrets, Quintel is unable to fully protect those secrets through the patent process and suffered damages as a result.  Brydges Decl. Ex. R (Magee Initial Report ¶ ¶ 128-129).  ████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ " *Id.* ¶ 131.

In quantifying the damages suffered by Quintel in this model, ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

1.     **Dr. Magee's Use of** ██████████████████████████████

Dr. Magee ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ Brydges Decl.

Ex. S (Magee Dep. at 109:14-19; 110:13-18) Ex. R (Magee Initial Rep. 6, 6.1). ████████████

███████████████████████████████████████████████

████████████████████████

     ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

[REDACTED]

Second, Huawei itself advertised UST as the major feature of its own products and had been selling the AAU 3902 products in Europe during the relevant time period -- utilizing Quintel's trade secrets. Brydges Decl. Ex. S (Magee Dep. at 103:23 - 104:6; 115:16-23).[1] Thus, Huawei's ability to monetize and sell its own products utilizing Quintel's trade secrets is itself evidence of strong demand for the technology. *Id*. (Magee Dep. at 114:18-23).

[REDACTED]

---

[1] Magee also noted that Huawei has admitted that while Ericsson has a product that competes with Huawei's AAU 3902, neither Ericsson nor any other competing product in the market has the UST feature, i.e., the feature that incorporates Quintel's trade secrets. Brydges Decl Ex. R (Magee Initial Report ¶ 52).



."  Brydges Decl. Ex. T (Veni Dep. Ex. 32 at 3d from last slide) (emphasis supplied); *id*. Ex. R (Magee Initial Rep. ¶ 115) █████████████████████████████████

Brydges Decl. Ex. S (Magee Dep. at 106:14 -- 108:2); Ex. R (Magee Initial Report Ex. 6).

As this evidence demonstrates, Dr. Magee applied generally accepted financial projection methodologies and principles to calculate the damages associated with Quintel's lost patent ownership.  He analyzed what he considered to be ████████████████████████

Huawei's attack on the sources upon which Dr. Magee relied is misplaced.  "[A]s a general rule, questions relating to the bases and sources of an expert's opinions affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's

consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F. 3d 546, 562 (5th Cir. 2004). Thus, a claim, for example, that an expert has an insufficient factual foundation for his opinion because he did not review all potentially relevant documents goes to the weight of his opinions, not their admissibility. *Id*. at 561-62. Defendants' attack on Dr. Magee's use of Quintel's sales projections is precisely the type of "weight" consideration that should be considered by jury.

The case of *Right of Way Maintenance Co. v. Gyro-Trac, Inc.*, No. H-05-cv-4081, 2007 U.S. Dist. LEXIS 34648 (S.D. Tex. May 11, 2007) is directly on point. There, the defendant moved to exclude certain expert testimony proffered by the plaintiff on lost profits on the grounds, *inter alia*, that the expert used assumptions instead of historical data and "should have used projections based on historical data" rather than the plaintiff's assertions. *Id*. at *6. The court denied the motion, noting that -- like Defendants here -- the defendant "offer[ed] no real argument about the methodology used by" the plaintiff's expert. *Id*. at *7. "Instead, [the defendant] disagree[d] with the underlying assumptions and figures that [the plaintiff's expert] plugged into his methodology." *Id*. Those types of arguments, the court held, "should be made on cross-examination of the witness in front of the trier of fact." *Id*.; *see B.J. Tidwell Indus. v. Diversified Home Prods.*, No. SA-06-CA-0264, 2007 U.S. Dist. LEXIS 78227, at * 8-10 (W.D. Tex. Oct. 19, 2007).

In short, Defendants have not demonstrated that Dr. Magee's reliance on Quintel's sales projections was unreliable. The motion should be denied.

**2.  Dr. Magee's Profit Margin and Patent Ownership Premium Assumptions Were Appropriate**

Defendants also take issue with Dr. Magee's use of ███████████████████████████

████████████████████████████████████████ Brydges Decl. Ex. R (Magee Initial

20

Rep. ¶ 135 and Ex. 10.1).  According to Defendants, Dr. Magee ████████████████████

████████████████████████████████████████████████████████████████████████

██████████  Def. MIL at 21.  This argument both misstates the facts and, as set forth above, is

directed to the weight to which the jury may give Dr. Magee's opinions, not their admissibility.

Dr. Magee did not "ignore" ████████████████████.  As he made clear at his

deposition, the reason he did not use ████████████████████████████████████

████████████████████████████████████████████████████.  Brydges

Decl. Ex. S (Magee Dep. at 142:3-11).  Defendants omit this testimony from their motion, and

instead claim that Dr. Magee should have used ██████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████  *See, e.g., Braun Elevator Co. v.*

*Thyssenkrupp Elevator Corp.*, 379 F. Supp. 2d 993, 1002 (W.D. Wis. 2005) (upholding lost

profit damages award where profit margin at issue "was adequately supported by historical profit

margins in the industry"); *Creative Dimensions in Mgmt., Inc. v. Thomas Group, Inc.*, No. 96-cv-

6318, 1999 U.S. Dist. LEXIS 5623, at *8 (E.D. Pa. April 16, 1999) (holding that plaintiff's

expert derived plaintiff's profit margin "from an analysis of plaintiff's tax returns and industry

norms," and that his methodology was "reasonably sound and he may testify to it").

Likewise, Dr. Magee's use of a patent ownership premium was derived from data in an

article published in *Licensing Economic Review* in 2016.  *See* Brydges Decl. Ex. R (Magee

Initial Rep. ¶ 136, n. 164).  Again, Defendants' complaint with Dr. Magee's reliance on this data

goes to the weight of his opinions, not their admissibility, and Defendants again fail to specify

what "Quintel-specific numbers" (Def. MIL at 21) would have been more appropriate, or why. They have made no case for exclusion of Dr. Magee's testimony in this respect.

### B.  Dr. Magee's Unjust Enrichment Model is Sound

Defendants do not take issue with the data, reliability, or relevance of Dr. Magee's opinions as to Quintel's unjust enrichment damages. Rather, they raise a single legal issue regarding this model, namely that Dr. Magee's "failure to apportion unjust enrichment according to the value of the allegedly misappropriated technology rather than the AAU3902 product as a whole requires exclusion of his opinion." Def. MIL at 22. Defendants are incorrect.

Damages in trade secret misappropriation cases can take several forms, including the defendant's actual profits from the use of the secret. *Bohnsack v. Varco, L.P.*, 668 F. 3d 262, 280 (5th Cir. 2012). If the defendant earned profits from the misappropriation, the plaintiff may recover the total amount of the defendant's profits *or* some apportioned amount corresponding to the actual contribution the trade secret(s) made to the defendant's profits. *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F. 2d 518, 539 (5th Cir. 1974). But nothing in *University Computing*, or any case cited by Defendants, requires a trade secret plaintiff to specifically apportion profits on sales made by the defendant using the plaintiff's trade secrets.

Indeed, Defendants rely on a series of inapposite cases for this point, beginning with *Waymo LLC v. Uber Techs., Inc.*, No. C 17-cv-00930, 2017 U.S. Dist. LEXIS 183688 (N.D. Cal. Nov. 6, 2017). *Waymo* did not deal with an unjust enrichment model based upon the misappropriator's sales and it has no application here. Moreover, the language Defendants rely on from *Waymo* -- i.e., that the plaintiff's expert's "reliance on the Qi slide's estimates with no apportionment for the legitimate elements of the Ottomotto acquisition encompassed therein would render his opinion unreliable under FRE 702" -- was merely *dicta*. It was the court's

*hypothetical* observation, did not constitute the holding of the case, and the court did not cite any supporting authority (from Texas or otherwise) holding that a plaintiff in a trade secret case must apportion profits on sales made by a defendant in a trade secret case. Indeed, the *Waymo* court did not discuss the elements of unjust enrichment at all in a trade secret case.

Defendants' reliance on *Alcatel USA v. Cisco Systems*, 239 F. Supp. 2d 660 (E.D. Tex. 2002) is even less availing. There, the plaintiff's expert attempted to tie the *value* of the plaintiff's trade secrets to the actual market value of the entity that misappropriated them at time that entity was acquired, i.e., the purchase price of the misappropriator. *Id.* at 668. The court found this approach too speculative. *Id.* Notably, in holding that "the value of the alleged trade secrets cannot be reasonably extrapolated from the purchase price," the court distinguished such a model from one where the plaintiff claims the defendant "financially benefited *from direct sales, for example, of the allegedly infringing product.*" *Id.* at 669 (emphasis supplied). Since the model at issue in *Alcatel* did not deal with the defendant's profits on sales attributable to the use of the trade secret, the court did not address apportionment in that context, nor did it cite or discuss any case law suggesting that the plaintiff must apportion the defendants' sales in a trade secret case seeking unjust enrichment damages.

Defendants otherwise rely on patent infringement cases that do not apply here. *See, e.g., Uniloc USA v. Microsoft Corp.*, 632 F. 3d 1292 (Fed. Cir. 2011); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585 (E.D. Va. 2013). In fact, Defendants' apportionment argument itself is based on the "entire market value rule," "which the Federal Circuit has applied in *patent* cases." *Bianco*, 2014 U.S. Dist. LEXIS 151967, at *59 (emphasis supplied). The rule "provides that if a patentee seeks a royalty base equivalent to the entire market value of the accused product, the patentee must prove that the patent-related feature is the basis for customer

demand." *Id.* Again, Defendants cite no case applying the rule in a trade secret case where a plaintiff seeks disgorgement based on the misappropriator's sales of products incorporating the trade secrets.

In any event, Defendants ignore ample evidence in the record supporting the notion that Quintel's technology drove demand for Quintel's AAU 3902 product. Dr. Magee testified to much of this evidence at his deposition, noting that ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ Brydges Decl. Ex. S (Magee Dep. at 165:24 - 166:20). Dr. Magee also cited this and other evidence in his report, including Defendants ████████████████████████████████████████████████ ███████ *Id.* at 166:21-25; Brydges Decl. Ex. R (Magee Initial Report ¶¶ 50-52 and notes 61-67). Dr. Magee also noted that ████████████████████████████████████ ██████████████████████████████. Brydges Decl. Ex. R (Magee Initial Report ¶ 52). ████████████████████████████████████████████████ ██████████████████████ *Id.* ¶ 53.

Defendants have failed to demonstrate that apportionment is even required in this case, much less that Dr. Magee's opinions on the unjust enrichment model are somehow unreliable. Likewise, there is sufficient evidence in the record from which the jury could conclude that Quintel's trade secrets did, in fact, drive demand for the AAU 3902 product. The motion should be denied.

## C. Dr. Magee's Reasonable Royalty Model is Proper

Defendants also take issue with the royalty base and royalty rate Dr. Magee employed in his reasonable royalty calculation, claiming that both numbers are flawed because they are "hypothetical." They are again incorrect.

First, Defendants misstate the underlying facts, suggesting that somehow Dr. Magee disguised the figures forming the basis of his calculations. Not so. Those figures and calculations are set forth at paragraphs 109 through 117 in his report. ███████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Dr. Magee testified to this effect at his deposition. Brydges Decl. Ex. S (Magee Dep. at 204:20 - 205:3).

Defendants' analysis, opportunistic as it is, stops here. They claim that █████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ █ ████████████████████████

███████████████████████████████████████████

[2] Contrary to Defendants' suggestion, Dr. Magee ███████████████████████████
███████████████████████████████████████ Brydges Decl. Ex. R (Magee Initial Rep. ¶ 115).



*Id.* ¶¶ 111-112.

Third, Dr. Magee next reduced each of these alternatives further by ████████

*Id.* ¶ 114.

Defendants' argument thus ignores that the royalty base used by Dr. Magee originated in part from their own data, and was refined and reduced through a generally accepted methodology commonly used by economists in calculating reasonable royalties.

Moreover, the fact that Dr. Magee's lump-sum royalty calculation is based upon a forecast of future revenues does not render it unreliable; damages experts commonly use such forecasts in determining a royalty base. *See, e.g., Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F. 3d 1371 (Fed. Cir. 2001) (upholding royalty based on five year annual projection of sales in infringer's business plan; "we have previously upheld awards of damages premised on a lump sum royalty payment based on a infringer's expected sales."). And to call this royalty base "hypothetical" -- as Defendants do in an attempt to discredit it -- signifies nothing, considering that the entire exercise is premised upon a *hypothetical* negotiation.

Defendants also attack ████████████████ referenced above as unreliable, but once again, their attack is not directed at the validity of the source of those numbers -- they do not dispute that they represent numbers proposed by the parties -- but rather their

disagreement with the appropriateness of those numbers. But "questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F. 3d 831, 856 (Fed. Cir. 2010). Thus, for example, the degree of comparability of the various licenses reviewed by Dr. Magee -- as well as the percentages proposed by the parties themselves -- "are factual issues best addressed by cross-examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F. 3d 1312, 1333 (Fed. Cir. 2012).[3] The motion should be denied.

### D. Dr. Magee's Market Value of Trade Secret Development Costs is Proper

Dr. Magee also will opine on the damages caused by Defendants' conduct in terms of Quintel's actual loss as measured by the investment value of the trade secrets at issue. He will do so by demonstrating what a reasonable investor would have paid for the secrets, using detailed development cost information provided by Quintel and applying a price-to-book ratio based upon market reports. Brydges Decl. Ex. R (Magee Initial Rep. ¶¶ 118-126).

Defendants first attack this model on the basis that it is "not an accepted or reliable method of valuing technology." Def. MIL at 25. But the case they cite for this proposition -- *Softel v. Dragon Medical and Scientific Comms.*, 891 F. Supp. 935 (S.D.N.Y. 1995) -- stands for no such thing. Rather, *Softel* merely held that the model was not used in the cases upon which the plaintiff there relied. In fact, it is well established that damages in a trade secrets case may be measured by the value that a reasonable investor would pay for the trade secrets. *Wellogix v. Accenture, L.L.P.*, 2013 U.S. App. LEXIS 25944, at *21 (5th Cir. 2013).

---

[3] Defendants' citation to *Skyhook Wireless v. Google*, No. CV 10-11571-RWZ, 2015 WL 13620764 (D. Mass. Feb. 18, 2015) is woefully incomplete. There, the court *denied* in all material respects the defendant's motion to preclude Dr. Magee's opinions. The court only granted the motion to the extent Dr. Magee's report contained a brief discussion of alternative forms of royalties that he made clear he was *not* advocating.

And Dr. Magee's use of a price-to-book ratio is, in fact, a generally accepted methodology used to value intangible assets: "[e]conomists have studied the valuation of intangible assets using P/B ratio or Tobin's Q for years." Brydges Decl. Ex. P (Magee Reply Decl. ¶ 64). Dr. Magee references economic literature supporting his use of this ratio (*id*. n. 52-53), which Defendants in their motion do not take issue with or even acknowledge. If Defendants wish to take issue with this approach, they may do so on cross-examination.

Defendants also reprise their claim that Dr. Magee's development cost model depends upon data supplied to him by Quintel and is therefore infirm. This is simply not the case, for the reasons set forth above relating to Dr. Magee's lost patent ownership model. *See, e.g., B.J. Tidwell*, 2007 U.S. Dist. LEXIS 78227, at *7 (rejecting *Daubert* challenge; "[i]t seems reasonable for a business valuation expert to rely on information the client provides about its customers, invoices, billing, finance charges, and financial records in valuating a business's economic loss.").

Lastly, Defendants raise fact issues that they allege render the development cost data used by Dr. Magee unreliable, including marketing costs and the time period covered by the data. Def. MIL at 27. These issues, like so many of Defendants' arguments, go to the weight to be accorded an expert's opinions, not their admissibility. The motion should be denied.

### E.    Dr. Magee Properly Relied Upon His Staff In Preparing His Report

Defendants also make the misleading claim that Dr. Magee "appears to have done no work of his own in coming to the conclusions reflected in his expert report, instead relying entirely on his staff[.]" Def. MIL at 27. In support of this argument, they cite limited, out-of-context snippets of his deposition showing nothing more than that he relied upon other personnel in preparing his report -- a common and perfectly acceptable approach.

Rule 703 permits an expert to rely on facts or data "of a type reasonably relied upon by experts in that particular field." And courts recognize that experts commonly rely on facts and data they did not personally collect, *Gussack v. Xerox Corp.*, 224 F. 3d 85, 94 (2d Cir. 2000), as well as "relying on one's assistants to carry out analyses." *McReynolds v. Sodexho Marriot Servs.*, 348 F. Supp. 2d 30, 36 (D.C. Dist. Ct. 2004). Dr. Magee did so here.[4] He made perfectly clear at his deposition that *he* prepared his reports in consultation with his staff, including Dr. Ikizler. Brydges Decl. Ex. S (Magee Dep. at 25:10-16). He asked Dr. Ikizler to create the first draft, and then edited extensively and/or wrote sections of multiple drafts. *Id*. at 26:1-7. And he emphasized at his deposition: "These are *my* opinions. And I want to state here that I may bypass, forget, or not remember, certain aspects of the report in response to your questions, but at trial -- I just want to say at trial, I'm going to rely on both reports and the exhibits." *Id*. at 27:1-6 (emphasis supplied).

Based on Dr. Magee's 47 page initial report, which involved the review of thousands of pages of documents in a multi-million dollar trade secrets case, and after a deposition that began at 9:10 a.m. and ended at 6:15 p.m., Defendants cite *four* instances in which Dr. Magee could not recite from memory, on the spot, precise explications for certain details in his report. They have not in any way demonstrated that the opinions in Dr. Magee's reports are not his own. The motion to exclude on this basis should be denied.

## F. There is No Basis To Limit Quintel To One Damage Model At Trial

Finally, Defendants claim that Dr. Magee should not be permitted to testify to more than one of this four damage models at trial, "lest he confuse the jury and create an unnecessary risk of double recovery." Def. MIL at 29. Setting aside whether the models are duplicative, however

---

[4] Defendants' own damages expert, W. Christopher Bakewell, did the same. Brydges Decl. Ex. U (Bakewell Dep. at 57:2-25; 58:11-19; 59:3-16: 63:3-8; 175:6-21: 217:6-11: 225:9-10; 229:7-13).

-- which the Court need not address until after a jury verdict -- Defendants are simply wrong as a matter of procedure.

The comment to Texas Pattern Jury Instruction 100.11 on Parallel Theories of Damages provides as follows:

> If several theories of recovery are submitted in the charge and any theory has a different legal measure of damages to be applied to a factually similar claim for damages, the Committee recommends that a separate damages question for each theory be submitted and that the above additional instruction be included earlier in the charge.

The charge itself eliminates any confusion and makes clear that it is the Court's job, not the jury's, to deal with the possibility of double recovery:

> In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Texas Pattern Jury Instruction 100.11.

Thus, for example, in *Waite Hill Servs. V . World Class Metal Works*, 959 S.W.2d 182 (Tex. 1998), the Texas Supreme Court made clear that a "party is generally entitled to sue and seek damages on alternative theories," and therefore a party's objection to the submission to the jury of more than one acceptable measure of damages is improper. *Id*. at 184. That is precisely the basis of Defendants' objection here, and it is equally improper. The proper remedy, as the court in *Waite Hill* made clear, is for the defendant to request, *before judgment*, that the trial court require the plaintiff to elect its remedy. *Id*. Thus, the relief Defendants' seek is inappropriate at this time. They must await the return of a verdict, at which time they may seek the appropriate relief prior to the entry of judgment.

January 2, 2018

**HARTER SECREST & EMERY LLP**

By: /s/ Jeffrey A. Wadsworth

Jeffrey A. Wadsworth
jwadsworth@hselaw.com
LEAD ATTORNEY
ADMITTED *PRO HAC VICE*
Erika N.D. Stanat
estanat@hselaw.com
ADMITTED *PRO HAC VICE*
Jerauld E. Brydges
jbrydges@hselaw.com
ADMITTED *PRO HAC VICE*
Kyra T. Keller
kkeller@hselaw.com
ADMITTED *PRO HAC VICE*
John P. Bringewatt
jbringewatt@hselaw.com
ADMITTED *PRO HAC VICE*
Jessica N. Clemente
jclemente@hselaw.com
1600 Bausch & Lomb Place
Rochester, NY 14604-2711
(585) 232-6500 - Telephone
(585) 232-2152 - Facsimile
**GRAY REED & McGRAW LLP**

Michael C. Kelsheimer
State Bar No. 24029360
mkelsheimer@grayreed.com
David T. DeZern
Texas Bar No. 24059677
ddzern@grayreed.com
1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135 – Telephone
(214) 953-1332 – Facsimile

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL
## AND CERTIFICATE OF SERVICE

This response and the accompanying Declaration of Jerauld E. Brydges, with exhibits, are filed under seal pursuant to Local Rule CV-5(a)(7) and the Protective Order entered in this case on January 11, 2016 because they contain information that has been designated as Confidential and/or Confidential Attorneys' Eyes Only by the parties. The undersigned hereby certifies that, pursuant to Local Rule CV-5(a)(7)(D) and Paragraph 10 of the Protective Order, all counsel of record have been electronically served via email with copies of this response, and the accompanying Declaration, with exhibit, on this 2nd day of January, 2018.

By: _David T. DeZern_