# United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| QUINTEL TECHNOLOGY LTD., § § <br> v. § Civil Action No. 4:15-CV-307 <br> § Judge Mazzant <br> HUAWEI TECHNOLOGIES USA, INC., § <br> FUTUREWEI TECHNOLOGIES INC., § <br> HUAWEI TECHNOLOGIES CO., LTD., <br> ZHENGXIANG MA | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Exclude Expert Testimony of Michael Jensen and Professor Stephen Magee (Dkt. #195). After reviewing the relevant pleadings and motion, the Court finds the motion to should be granted in part.

## BACKGROUND

Plaintiff Quintel Technology Ltd. ("Quintel") "designs, develops, and delivers advanced high-efficiency, high-performance antenna solutions for mobile operators to improve their delivery of wireless network services" and "has developed cutting-edge, proprietary antenna technology to better serve wireless network operators and users." (Dkt. #20 at ¶¶ 2, 10). Collectively, Huawei Technologies USA, Inc., FutureWei Technologies, Inc., Huawei Technologies Co., Ltd. (collectively "Huawei"), and Zhengxiang Ma (together with Huawei, "Defendants") are "telecommunications equipment maker[s] and, among other things, manufacture[] base stations for wireless networks." (Dkt. #20 at ¶ 11).

Around July of 2008, David Barker, the chief technology officer and an employee of Quintel, "conceived a concept to improve reception between an antenna providing cellular telephone and/or data services, and a mobile receiving telephone and/or data services from the

antenna" (the "Per User Tilt Concept") (Dkt. #20 at ¶¶ 12–13). "In 2009, because of potential synergies in their respective business models, Quintel and [Defendants] explored whether they might partner together to service mobile operators in the wireless network industry." (Dkt. #20 at ¶ 14).

According to Plaintiff, after the parties entered into a non-disclosure agreement ("NDA"), Plaintiff began to share confidential and proprietary information and trade secrets, including its proprietary antenna technology, with Defendants (Dkt. #20 at ¶¶ 20, 30–45). In particular, Plaintiff showed Defendants how the "Per User Tilt Concept" works and provided some additional confidential and proprietary information regarding Plaintiff's antenna technology, including information about Plaintiff's patents—all information Plaintiff contends was protected under the NDA.

Plaintiff alleges the parties "ultimately could not agree on final terms to any business or partnering relationship" and that "despite its professed interest, [Defendants] never intended to enter into a partnering relationship with Quintel." (Dkt. #20 at ¶¶ 44–46). FutureWei filed a nonprovisional patent application with the United States Patent and Trademark Office ("USPTO"), claiming the benefit of its provisional patent application "seeking protection of an invention based on the Quintel confidential and proprietary antenna technology that Quintel had shared under the terms of the . . .NDA." (Dkt. #20 at ¶ 50). On November 18, 2014, the USPTO issued FutureWei Patent No. US 8,891,647 B2 ("the '647 patent"), titled "System and Method for User Specific Antenna Down Tilt in Wireless Cellular Networks." (Dkt. #20 at ¶ 52). According to Plaintiff, the '647 patent includes claims for user specific antenna down tilt, which Plaintiff alleges is a characteristic of the Per User Tilt Concept. Specifically, Plaintiff alleges the '647 patent includes

one or more claims to which David Barker made an inventive contribution, but the '647 patent failed to name David Barker as a joint inventor (Dkt. #20 at ¶ 52).

As a result, on May 15, 2015, Plaintiff filed suit against Defendants. In its First Amended Complaint, filed December 1, 2015, Plaintiff asserts the following claims against Defendants: (1) breach of contract; (2) misappropriation of trade secrets; (3) unfair competition by misappropriation; (4) common law fraud and fraud in the inducement; (5) promissory estoppel; (6) unjust enrichment; (7) accounting; and (8) correction of patent inventorship—35 U.S.C. § 256 (Dkt. #20 at ¶¶ 55–117).[1]

On December 22, 2017, Defendants filed their Motion to Exclude Expert Testimony of Michael Jenson ("Jensen") and Stephen Magee ("Magee") (Dkt. #195). On January 2, 2018, Plaintiff filed its response (Dkt. #211). At the pretrial conference, held on January 4, 2018, the Court allowed the parties to file supplemental briefing regarding the admissibility of Jensen's anticipated testimony. As a result, on January 12, 2018, Defendants filed their reply (Dkt. #234), and on Janaury 19, 2018, Plaintiff filed its sur-reply (Dkt. #245).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert,

---

[1] On September 27, 2016, Judge Davidson dismissed the accounting claim for failure to state a claim, and the breach of contract claim against Dr. Ma in his individual capacity was dismissed as conceded by Quintel (Dkt. # 42 at p. 39). On January 17, 2018, the Court adopted, in pertinent part, the Magistrate Judge's Report and Recommendation recommending Quintel's breach of contract claim based on failure to destroy documents and unfair competition by misappropriation claim be dismissed with prejudice (Dkt. #239).

whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue.

4

*Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

## ANALYSIS

Defendants argue exclusion of Jensen's testimony is proper because his opinions concern matters outside his purported expertise. Specifically, Defendants claim that Jensen cannot testify as to (1) Huawei's thoughts and beliefs; (2) Plaintiff's co-inventorship claim; (3) Plaintiff's claim that its alleged trade secrets were not known and valuable; (4) Plaintiff's alleged trade secrets; and (5) any alleged misappropriation.

Regarding Magee, Defendants contend exclusion is necessary because (1) Magee's four damages theories are based on unreliable data, use unreliable methodology, or are unreliably applied to the facts of this case, and (2) Magee's purported opinions are not his own. In the alternative, Defendants aver that if Magee is permitted to testify, his testimony should be limited to no more than one of his four damage theories.

The Court first addresses the admissibility of Jensen's testimony followed by Magee's.

**I. Jensen**

As explained above, Defendants claim that Jensen's opinions as they relate to five different categories should be excluded because such opinions are outside Jensen's purported expertise. The Court addresses each argument separately.

**a. Huawei's Thoughts and Beliefs**

Defendants contend that Jensen's opinions as they relate to Defendants' "thoughts and beliefs via interpretation of various documents" are inadmissible because "[i]t is for the jury to interpret [such] underlying documents." (Dkt. #195 at pp. 18–19). Conversely, Plaintiff argues

5

that Jensen's reports "constitute his *understanding* and *interpretation* of highly technical documents and information well within his filed of expertise on matters relevant to Quintel's claims. [Jensen] is not purporting to read Huawei's 'mind.'" (Dkt. #211 at p. 18) (emphasis in original).

"[A] trial court may strike expert testimony that evaluates a party's state of mind, as that evaluation is within the province of the jury." *Fisher v. Halliburton*, No. H-05-1731, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21, 2009) (citing *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007)). "'An expert's credentials do not place him in a better position than the [trier of fact] to draw conclusions about a defendant's state of mind.'" *Id.* (alterations in original) (quoting *Marlin*, 248 F. App'x at 541). As such, Jensen's opinions as they relate to Defendants' state of mind or intent are inadmissible. *See id.*; *accord Retractable Tech. Inc. v. Abbot Lab., Inc.*, No. 5:05-CV-157, 2010 WL 11531436, at *4–*7 (E.D. Tex. June 18, 2010) (excluding an expert's testimony as it related to a party's knowledge, intent, or belief). However, Jensen is permitted to offer opinions concerning the purpose, importance, or content of technical documents in order to assist the jury's understanding of such documents. *See Romero v. Wyeth Pharm., Inc.*, No. 1:03-CV-1367, 2012 WL 12905978, at *6 (E.D. Tex. Apr. 26, 2012).

b. **Co-Inventorship**

Defendants aver that Jensen's opinions as they relate to Plaintiff's claim that David Barker is a co-inventor of the '647 patent are outside Jensen's purported expertise. Specifically, Defendants claim that in offering his opinion, Jensen fails to apply any legal standards, but instead bases his entire opinion "on his personal experience as a business owner." (Dkt. #195 at p. 20). Conversely, Plaintiff argues "Jensen's extensive expertise in the field of antenna design and

analysis well qualifies him to opine on [Defendants'] use and inclusion of Quintel's [Per User Tilt] technology in the '647 Patent." (Dkt. #211 at p. 19).

On December 18, 2017, Magistrate Judge Craven issued a Report and Recommendation recommending dismissal of Plaintiff's correction of inventorship claim (Dkt. #190). In Plaintiff's objections to the Magistrate Judge's Report and Recommendation, Plaintiff argued that the Magistrate Judge incorrectly dismissed Plaintiff's inventorship claim (Dkt. #209 at pp. 4–9). In the Court's Order Adopting Report and Recommendation of the United States Magistrate Judge, the Court stayed its consideration of Plaintiff's objections "until such time as the jury trial has been resolved." (Dkt. #240 at p. 13). As such, the Court reserves its ruling on the admissibility of Jensen's opinions as they relate to Plaintiff's correction of inventorship claim until the resolution of the jury trial.

c. **Whether Plaintiff's Alleged Trade Secrets Were Known and Valuable**

Defendants contend that the Court "should exclude testimony from Dr. Jensen regarding Quintel's claim that its alleged trade secrets were not known and valuable." (Dkt. #195 at p. 20). To support their argument, Defendants claim that "Jensen is not being offered as an expert" on this particular topic, but that his opinion, "based on his personal experience and 'literature,' . . . merely summarizes Quintel's litigation proposition that its alleged trade secrets were known and valuable." (Dkt. #195 at p. 21). Conversely, Plaintiff responds that Jensen "is more than qualified to opine on the industry itself and what is both 'known' and 'valuable' in the industry" and that "[a]ny perception that Dr. Jensen lacks sufficient 'industry experience' . . . goes to the weight of his testimony, not its admissibility." (Dkt. #211 at p. 19).

An expert witness must be qualified "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. "A court must exclude an expert witness 'if it finds that the witness

7

is not qualified to testify in a particular field or on a given subject.'" *Engenium Sol., Inc. v. Symphonic Tech., Inc.*, 924 F. Supp. 2d 757, 769 (S.D. Tex. 2013) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). "However, 'Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.'" *Id.* (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

Jensen has twenty-seven years of experience in design and analysis of communications systems, has consulted with various corporations to create antenna and circuit designs for various wireless communications systems, and founded a company that created and commercially marketed software for radio frequency circuit design. (*See* Dkt. #211, Exhibit 3 at ¶ 8). As such, the Court finds that Jensen's experience qualifies him to opine about what is both known and valuable in this particular industry. Regarding Defendants' other objections, the Court finds that such objections fall within the scope of cross-examination. *See Daubert*, 509 U.S. at 596.

### d. Trade Secrets

Defendants argue that Jensen's testimony regarding trade secrets is inadmissible because "Jensen did not identify a single trade secret in his opening expert report . . . never opined on several of the required elements of a trade secret" and such testimony "is not within the scope of his expertise." (Dkt. #195 at p. 22). Plaintiff claims that "Jensen will not be opining on the legal definition of 'trade secret'" but instead will "provide [an] opinion on the extent to which Quintel's technology was well known or valuable in the industry, as well as address[] many of the factual questions that play a role in determining what constitutes a trade secret." (Dkt. #211 at p. 20).

As explained above, the Court finds that Jensen may provide opinions regarding whether Plaintiff's alleged trade secrets were known and valuable within the industry. However, the Court

finds that Jensen may not provide opinions as to what constitutes a trade secret or the legal definition of a trade secret as such testimony is outside the scope of his expert report. *See* (Dkt. #195, Exhibit 4 at p. 18 ("I have not been asked nor do I [Jensen] have the legal definition of a trade secret."); Dkt. #211, Exhibit 3 (Jensen's report, which fails to make any mention of or reference to an opinion regarding what constitutes a trade secret)).

### e. Misappropriation

Defendants aver that Jensen's conclusions regarding the alleged misappropriation of trade secrets are unreliable and not based on scientific principles. Specifically, Defendants claim that Jensen never inspected the product, but instead "invent[ed] a new test for misappropriation—similarity"—which Jensen failed to provide any standards or legal precedent to support (Dkt. #195 at p. 23). Conversely, Plaintiff contends that inspection of a product is not the only reliable method an expert can base his or her opinion on. Further, Plaintiff responds that Jensen "follows his 'similarity' discussion with an extensive analysis" explaining "Defendants' incorporation of Quintel's technology" and that Defendants "fail to specify *what* is unreliable about his detailed comparison." (Dkt. #211 at p. 21; Dkt. #245 at p. 6) (emphasis in original).

Expert testimony is reliable if it is "the product of reliable principles and methods." FED. R. EVID. 702(c). "The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all [Rule 702] requirements have been met." *Engenium*, 924 F. Supp. 2d at 769 (citing *Daubert*, 509 U.S. at 593 n.10).

Here, Jensen compares side-by-side Figure 2B, a block diagram from the '647 patent, with a Quintel block diagram explaining how a cellular base station can implement Per User Tilt technology. Following Jensen's opinions as to the similarities between the diagrams, Jensen provides an analysis explaining how he believes Defendants incorporated Plaintiff's technology in

the '647 patent. (*See* Dkt. #211, Exhibit 3 at ¶¶ 154–162). The Court finds Jensen's methodology and analysis explaining such is reliable. *See Engenium*, 924 F. Supp. 2d at 770–72 (finding that manually comparing code side-by-side is not an inherently unreliable methodology as long as the expert provides explanation and support for such methodology and reliability). As such, the Court does not exclude Jensen's opinions as they relate to any alleged misappropriation.

Accordingly, the Court finds that Jensen's opinions are limited only to the extent that he cannot provide testimony concerning Defendants' state of mind or intent and what constitutes or the legal definition of a trade secret.

**II. Magee**

Defendants contend exclusion of Magee's testimony is warranted because (1) Magee's four damages models are based on unreliable data, use unreliable methodology, or are unreliably applied to the facts of this case, and (2) Magee's purported opinions are not his own. In the alternative, Defendants aver that if Magee is permitted to testify, his testimony should be limited to no more than one of his four damage models. The Court addresses each argument in turn.

**a. Magee's Four Damage Models**

Plaintiff seeks to have Magee testify as to four different damage models. Defendants claim each model "bear[s] no relationship to the facts or to the economic evidence in this case" and fails to meet "the standard of reliability established in *Dabutert*." (Dkt. #195 at p. 24). Conversely, Plaintiff responds that "[e]ach of [Magee's] four theories [are] properly gounded in reliable data and in Dr. Magee's experience, education, and analysis." (Dkt. #211 at p. 22). Further, Plaintiff states that the brunt of "Defendants' attack on Dr. Magee demonstrates nothing more than that they disagree with his conclusions," which "is an insufficient basis to exclude expert testimony." (Dkt. #211 at p. 22). The Court addresses each damage model separately.

### i. Lost Patent Ownership

Magee's Lost Patent Ownership damage model calculates the alleged damages Plaintiff suffered "because of Defendants' misappropriation of Quintel's trade secrets," which prevented Plaintiff from being able "to fully protect those secrets through the patent process." (Dkt. #211 at p. 22). In calculating such lost profits, Magee "used Quintel's SONWav sales projections . . . for the years 2018 through 2022." (Dkt. #211 at p. 23). Specifically, Magee found approximately $800 million as the worldwide SONWav revenue projection for 2018–2022. (*See* Dkt. #211, Exhibit 19 at pp. 82–83). Magee "then calculated operating profits on those revenue projections at an 18.1% margin for U.S. sales and 11% for other regions." (Dkt. #211 at p. 23). Next, Magee "attributed 28.5% . . . of the resulting profit to Quintel's trade secrets" and lastly "applied a further discount of 47% . . . to account for a 'patent ownership premium.'" (Dkt. #211 at p. 23).

Regarding Magee's $800 million sales projection, Defendants claim that such projection "has no connection to reality . . . was invented by Quintel's [Chief Technology Advisor] David Barker for purposes of this litigation" and "has been subject to no analysis or scrutiny." (Dkt. #195 at pp. 25-26). Further, Defendants contends that "[g]iven that Quintel has never sold a single SONWav device . . . Magee simply accepted his client's projection of a massive increase in sales and conducted no independent research [into] whether the projected figures given to him . . . were valid, or even reasonable." (Dkt. #195 at pp. 27–28) (citations omitted). As to Magee's assumptions on profit margin and patent ownership premium, Defendants argue there is a "fundamental mismatch" between "Magee's profitability numbers and the facts of this case" rendering Magee's opinions inadmissible (Dkt. #195 at p. 29).

Plaintiff responds that Magee derived such revenue projections from "projections provided by Quintel, and [Magee's] team had direct discussions with David Barker, Quintel's chief

11

technology officer, regarding those projections." (Dkt. #211 at p. 23). Furthermore, Plaintiff states that Magee, in at least four ways, "subjected these projections to analysis and scrutiny and determined them to be reasonable." (Dkt. #211 at p. 23). Moreover, Plaintiff claims that Magee "analyzed what he considered to be the 'best estimate' available to him regarding Quintel's SONWav sale projection . . . assessed that figure in the context of the value of and demand for Quintle's technology in the market, and further compared it to figures generated by Huawei's own assessment of sales volumes." (Dkt. #211 at p. 25). Responding to Defendants' arguments as they relate to Magee's profit margin and patent ownership premium assumptions, Plaintiff claims such arguments go to the weight and not admissibility of Magee's opinions.

In sum, Defendants disagree "with the underlying assumptions and figures [Magee] plugged into his methodology" and the extent that Magee conducted independent research. *Right of Way Maint. Co. v. Gyro-Trac, Inc.*, No. H-05-4081, 2007 WL 1428634, at *2 (S.D. Tex. 2007 May 11, 2007). The Court finds these objections fall within the scope of cross-examination. *See id.* As such, the Court finds exclusion of Magee's testimony as it relates to his Lost Patent Ownership damage model is improper. *See id.*; *Daubert*, 509 U.S. at 596; *B.J. Tidwell Indus., Inc. v. Diversified Home Products, Inc.*, No. SA-06-CA-0264, 2007 WL 3118300, at *2 (W.D. Tex. Oct. 19, 2007) ("It seems reasonable for a business valuation expert to rely on information the client provides about its customers, invoices, billing, finance charges, and financial records in valuating a business's economic loss").

### ii. Unjust Enrichment

Magee's Unjust Enrichment damage model "reflects damages to Quintel due to Huawei's 'misappropriation' and 'use' of trade secrets, without paying for them." (Dkt. #211, Exhibit 19

at ¶ 91). Magee "calculated Huawei's Unjust Enrichment from the sales of its AAU3902 Product that uses Quintel's trade secrets." (Dkt. #211, Exhibit 19 at ¶ 91).

Defendants contend that Magee's calculation is flawed and inadmissible. Specifically, Defendants claim that Magee does not attempt to apportion his unjust enrichment damages between those features of the AAU3902 that use Plaintiff's technology and those that do not. As such, Defendants argue that "Magee's failure to apportion unjust enrichment according to the value of the allegedly misappropriated technology rather than the AAU3902 product as a whole requires exclusion of his opinion." (Dkt. #195 at p. 30). Conversely, Plaintiff responds that "Defendants have failed to demonstrate that apportionment is even required in this case, much less that Dr. Magee's opinions on the unjust enrichment model are somehow unreliable." (Dkt. #211 at p. 30).

If a defendant is found to have "enjoyed actual profits" in misappropriating trade secrets, "a type of restitutionary remedy can be afforded [to] the plaintiff—either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). Whether the full amount of the infringer's profits is attributable to the alleged misappropriation of trade secrets is for the jury to decide when awarding damages. *See Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 855–56 (E.D. Tex. 2012).

The Court finds that Magee's failure to apportion is not fatal to his opinion since such a determination is for the jury. *See id.* Further, the cases in which Defendants rely on to support the

proposition that apportionment is required are distinguishable from the case at hand. As such, the Court declines to exclude Magee's opinion as it relates to his Unjust Enrichment damage model.[1]

### iii. Reasonable Royalty

Magee's Reasonable Royalty damage model represents the lost reasonable royalties Huawei should have paid Quintel. "A reasonable royalty represents compensation for the use of intellectual property that a willing licensor and willing licensee would have negotiated in an arm's-length setting prior to infringement or misappropriation." (Dkt. #211, Exhibit 19 at ¶ 105).

Defendants maintain that Magee's calculation is flawed because "Magee uses hypothetical numbers for both his royalty base and royalty rate to generate a grossly inflated result." (Dkt. #195 at p. 32). Plaintiffs claim that Magee's report describes in detail the analysis Magee undertook to arrive at such results. (*See* Dkt. #211, Exhibit 19 at ¶¶ 109–117). Further, Plaintiff contends that Defendants' argument "ignores that the royalty base used by Dr. Magee originated in part from [Defendants'] own data, and was refined and reduced through a generally accepted methodology commonly used by economists in calculating reasonable royalties." (Dkt. #211 at p. 32).

"'As a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned [to] that opinion rather than its *admissibility* and should be left to the jury's consideration.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (emphasis in original) (citation omitted). "It is the role of the adversarial system, not the court, to highlight weak evidence." *Id.* Further, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

---

[1] Pursuant to the Court's Order Adopting Report and Recommendation of the United States Magistrate Judge (Dkt. #239), the Court dismissed Plaintiff's unjust enrichment claim as it relates to all Defendants except Zhengxiang Ma. As such, Magee's testimony concerning his Unjust Enrichment damage model is permissible only as it pertains to Ma.

At the heart of Defendants' argument, Defendants merely disagree "with the underlying assumptions and figures that [Magee] plugged into his methodology." *Right of Way*, 2007 WL 1428634, at *2. "Those type of arguments should be made on cross-examination of the witness in front of the trier of fact." *Id.* As such, the Court finds exclusion of such testimony is improper. *See id.*; *Daubert*, 509 U.S. at 596.

### iv. Market Value of Plaintiff's Trade Secret Development Cost

Magee's Market Value damage model determines "the damages caused by Defendants' conduct in terms of Quintel's actual loss as measured by the investment value of the trade secrets at issue." (Dkt. #211 at p. 33). Stated differently, Magee calculates "what a reasonable investor would have paid for the secrets, using detailed development cost information provided by Quintel and applying a price-to-book ratio based upon market reports." (Dkt. #211 at p. 33). This approach consists of two steps: (1) "calculate the book value of what Quintel paid for the research and development of the trade secrets;" and (2) "adjust that to market value using the relevant industry stock market value to book ratio, times the book value of the associated development costs." (Dkt. #211, Exhibit 19 at ¶ 119).

Defendants provide three reasons for why they believe "Magee's approach is conceptually and methodologically flawed." (Dkt. #195 at p. 33). First, "[a]pplying a set multiplier to development costs is not an accepted or reliable method of valuing technology;" second, "Magee's trade secret development costs theory depends on unreliable Quintel cost data that Professor Magee made no effort to check or validate;" and third, "Quintel's cost estimates bear no relationship to the alleged trade secrets or the alleged misappropriation at issue in the litigation." (Dkt. #195 at pp. 34–35). Plaintiff responds stating that "it is well established that damages in a trade secrets case may be measured by the value that a reasonable investor would pay for the trade

secrets." (Dkt. #211 at p. 33). Further, Plaintiff points out that Defendants' remaining arguments are merely repetitive of the arguments made in attacking Magee's Lost Patent Ownership damage model, which go to the weight and not the admissibility of Magee's opinions.

Defendants disagree with the method, assumptions, and figures Magee uses in his calculation. As explained earlier, these types of objections and arguments are better dealt with on cross-examination. *See Right of Way*, 2007 WL 1428634, at *2; *Daubert*, 509 U.S. at 596. As such, the Court does not exclude Magee's testimony as it relates to his Market Value damage model.

### b. Magee's Reliance Upon His Staff in Preparing His Report

Defendants aver that "Magee's opinions also should be excluded because [Magee] appears to have done no work of his own in coming to the conclusions reflected in his expert report, instead relying entirely on his staff, particularly Devrim Ikizler." (Dkt. #195 at p. 35). Plaintiff responds that Magee appropriately relied on his staff in preparing his report and that the opinions within the report are his own.

"Experts must undertake their own analyses and may not blindly rely on the opinions of others." *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-33-JRG-RSP, 2015 WL 12911530, at *2 (E.D. Tex. Sept. 30, 2015). "Preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with [Federal Rule of Civil Procedure] 26(a)(2)(B)'s requirement that the expert 'prepare' the report." *Seitz v. Envirotech Sys. Worldwide Inc.*, No. H-02-4782, 2008 WL 656513, at *2 (S.D. Tex. Mar. 6, 2008) (citations omitted). "Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." *Id.* (citation omitted). "The party

16

seeking to strike an expert's testimony has the burden of proving that the report was 'ghost-written.'" *Id.*

Magee testified during his deposition that in preparing his report he sat down with the consultants, his staff, and Ikizler to outline how he saw the report being laid out (Dkt. #211, Exhibit 20 at p. 10). After discussing the report's outline, Ikizler prepared the first draft (Dkt. #211, Exhibit 20 at p. 11). Magee and Ikizler then went "back and forth" discussing the content and structure of the report followed by Magee making edits (Dkt. #211, Exhibit 20 at p. 11). When asked whether Magee wrote the report, Magee answered that he "ultimately wrote the whole thing in the sense that [he] either wrote sections of it or mainly edited extensively the report on multiple drafts." (Dkt. #211, Exhibit 20 at p. 11). Further, Magee made clear that the opinions in the reports are indeed his own (Dkt. #211, Exhibit 20 at p. 12).

Taking Magee's testimony as true, the Court finds that Defendants failed to meet their burden of showing that Magee "had so little involvement in preparing the reports of his opinions as to warrant striking his opinions." *Seitz*, 2008 WL 656513, at *3. As such, the Court finds striking Magee's report would be inappropriate.

### c. Scope of Magee's Testimony

Defendants claim that if "Magee's opinions are not excluded, [Magee] should not be permitted to present duplicative damage[] theories at trial, lest he confuse the jury and create an unnecessary risk of double recovery." (Dkt. #195 at p. 37). Plaintiff responds that "Defendants are simply wrong as a matter of procedure." (Dkt. #211 at p. 36).

"A party is generally entitled to sue and to seek damages on alternative theories." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *accord Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987). However, "[a] party is

not entitled to a double recovery." *Id.* "A double recovery exists when a plaintiff obtains more than one recovery for the same injury." *Id.* As such, to preclude double recovery when a party seeks damages on alternative theories, the defendant should request, "before judgment, that the trial court require [the plaintiff] to elect its remedy." *Id.*

Here, Defendants attempt to preclude Plaintiff from doing what the law permits—seek damages on alternative damages. If the jury awards Plaintiff damages pursuant to different damage theories, Defendant should, before judgment, request the Court to require Plaintiff to elect its remedy. As such, the Court does not limit Magee's testimony to one damage model.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Exclude Expert Testimony of Michael Jensen and Professor Stephen Magee (Dkt. #195) is hereby **GRANTED in part.** Specifically, the Court finds that Jensen's opinions are limited only to the extent that he cannot provide testimony concerning Defendants' state of mind or intent and what constitutes or the legal definition of a trade secret.

**SIGNED this 30th day of January, 2018.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE